UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANITA PATRICIA BAKER-SCHNEIDER,
Personal Representative of the Estate of
Michael Edward Schneider,

         Plaintiff,

                                      Civil Case No. 15-12897
v.                                    Honorable Linda V. Parker

BENNY N. NAPOLEON, WAYNE COUNTY
SHERIFF; JERIEL HEARD, DIRECTOR OF
JAILS; DAVID PRAEDEL, COMMANDER OF
THE WILLIAM DICKERSON DETENTION
FACILITY; DR. KEITH C. DLUGOKINSKI,
DIRECTOR OF JAIL SERVICES FOR WAYNE
COUNTY; DR. RUBAB F. HUQ; WAYNE COUNTY
CORPORAL GERALD THOMAS; COUNTY OF WAYNE,
and WAYNE COUNTY SHERIFF'S DEPARTMENT,

         Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

      This lawsuit arises from Michael Edward Schneider's suicide while a pretrial detainee in the Wayne County Jail's William Dickerson Detention Facility. Schneider's wife and the personal representative of his estate, Anita Patricia Baker-Schneider ("Plaintiff"), brings claims under 42 U.S.C. § 1983 asserting that Defendants were deliberately indifferent to Schneider's serious medical needs and claims under Michigan law asserting that Defendants were grossly negligent in connection with Schneider's care.

Presently before the Court is Defendants' motion for summary judgment, filed pursuant to Federal Rule of Civil Procedure 56 on July 31, 2017. The parties have fully briefed the motion. Finding the facts and legal arguments sufficiently presented in those briefs, the Court is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f). For the reasons that follow, the Court is granting in part and denying in part Defendants' motion.

## I.      Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id*. at 323. Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986) (internal quotation marks and citation omitted). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252. The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

## II. Factual and Procedural Background

At 9:35 a.m. on Friday, November 7, 2014, Schneider was booked into the Wayne County Jail's William Dickerson Detention Facility ("Dickerson Facility") on a misdemeanor domestic violence charge. (Defs.' Mot., Ex. 1, ECF No. 32-2.) Police officers from the City of Ecorse transported Schneider to the Dickerson Facility after his arraignment in state district court, where the judge ordered him held without bond pending his pretrial on November 18, 2014. (*Id.*, Ex. 2, ECF No. 32-3.) Where there are mental health or suicidal concerns regarding a prisoner, judges often make note of it in their orders. (*Id.*, Ex. 3 at 40, ECF No. 32-4 at Pg ID 246.) However, the only condition noted in the judge's order was that Schneider should have no contact with the victim, Plaintiff. (*Id.*, Ex. 2, ECF No. 32-3.) Plaintiff indicates that after Schneider was arrested on October 13, 2014, he was held in the Ecorse Police Department jail where he verbalized suicidal ideations and placed a

cloth tightly around his neck.[1]  (Pl.'s Resp. at 15, ECF No. 34 at Pg ID 391.)  In

response, the Ecorse police transported Schneider to Henry Ford Wyandotte Hospital

with a complaint of "Altered Mental Status."  (*Id.*)

Plaintiff further indicates that on October 26, 2014, Schneider attempted

suicide by cutting himself on exposed metal on his bed in the Ecorse jail because he

was in so much pain from heroin withdrawal. (*Id.*)  Plaintiff was rushed to the

hospital.

At 12:00 p.m. on November 7, 2014, after Schneider was booked at Wayne

County's Dickerson Facility, Medical Assistant Carolyn Storey conducted his intake

medical screening using the online intake questionnaire recommended by the National

Commission on Correctional Health Care.  (Defs.' Mot., Ex. 5 at WC 0263-66, ECF

No. 32-6 at Pg ID 254-57.)  Storey has a bachelor's degree in nursing and, during the

relevant time, was a Wayne County employee.[2]  (Defs.' Reply, Ex. 2.2 at 5, 6, ECF

No. 40-4 at Pg ID 832.)

During Schneider's intake screening, he reported a recent hospitalization

related to a rib fracture and chest pains; admitted to daily alcohol (beer) and heroin

use; admitted experiencing heroin withdrawal symptoms such as vomiting, diarrhea,

and hearing voices; and indicated that he had or previously had hepatitis C and

---

[1] Plaintiff does not cite any evidence to support these factual assertions.
[2] Storey was employed by Wayne County for twenty-three years; however, she
became an employee of the county's contractor, Correct Care Solutions, in 2016 or
2017.  (Defs.' Reply, Ex. 2.2 at 4-5, ECF No. 40-4 at Pg ID 831-32.)  She
continued to work as a medical assistant in the Wayne County Jail, however.  (*Id.*)

diabetes. (Defs.' Mot., Ex. 5 at WC 0264-66, ECF No. 32-6 at Pg ID 255-57.)

Schneider described his present state of health as "poor." (*Id.* at WC 0264, Pg ID 255.) When Storey asked Schneider if he had ever attempted to harm himself or commit suicide, Schneider answered "Yes"; however, he denied current suicidal thoughts. (*Id*. at WC 0265, Pg ID 256.) Based on her observations, Storey did not think Schneider was actively suicidal. (Defs.' Reply, Ex. 2.2 at 40, ECF No. 40-4 at Pg ID 840.) Schneider indicated that he had a history of psychiatric illness or treatment for being bipolar and a self-cutter. (Defs.' Mot., Ex. 5 at WC 0265, ECF No. 32-6 at Pg ID 256.)

Storey observed that Schneider was not acting or talking in a strange or unusual manner, did not show signs of depression, did not appear overly anxious, afraid, angry, or unusually shy or ashamed. (*Id*.) Storey did not observe any visible signs or scars from previous suicide attempts. (*Id*.) Storey first noticed cuts on Schneider's arms when she went to take his blood pressure. (Defs.' Reply Br., Ex. 2.2 at 37, ECF No. 40-4 at Pg ID 840.) When she asked him what they were from, he said he was a self-cutter. (*Id*. at 39.) Schneider had multiple linear scars (1 1/2 inches to 6 inches) on his posterior right forearm and multiple small abrasions (less than 1/2 inch by 1/4 inch) on the dorsum of his right and left hands and the dorsa of three fingers on his right hand. (Defs.' Mot., Ex. 8, ECF No. 32-9.) Schneider provided that the cuts were from hitting walls and self-cutting. (*Id*., Ex. 5 at WC 0264, ECF No. 32-6 at Pg ID 255.)

During her deposition in this matter, Storey answered "Yes" when asked whether she understood that people engage in self-cutting for reasons other than suicide. (Defs.' Reply, Ex. 2.2 at 39-40, ECF No. 40-4 at Pg ID 840.) She explained that some individuals experiencing heroin withdrawal feel like there is something in their skin and they are trying to dig it out. (*Id*.) Storey learned that people with anxiety or obsessive compulsive disorder also cut themselves. (*Id*.)

After completing her intake screening of Schneider, Storey referred him for follow-up medical and psychiatric evaluations. (Defs.' Mot., Ex. 5 at WC 0266, ECF No. 32-6 at Pg ID 257.) Less than twenty minutes after Storey began her intake medical screening of Schneider, he was seen by Registered Nurse Mildred Neal in the jail's medical clinic. (*Id*. at WC 0269, Pg ID 260.) Neal noted that Schneider had a history of hypertension for the past twenty years, diabetes for the past five years, rib fracture, hepatitis C, and heroin abuse. (*Id*.) Schneider told Neal that he was taking Hydrocodone for back pain, but he did not remember the names of his other medications or the name of his pharmacy. (*Id*.) Neal wrote that Schneider was currently complaining of heroin withdrawal. (*Id*.) She took his resting blood sugar and sent him to see the medical doctor on duty in the clinic, Defendant Rubab Huq, M.D. (*Id*.)

At 1:32 p.m. on November 7, 2014, Huq began to exam Schneider in the clinic. (*Id*. at WC 0267, ECF No. 32-6 at Pg ID 258.) Huq documented that Schneider had a rib fracture diagnosed two weeks earlier, although he experienced no pain when she

palpitated his ribs. (*Id*. at WC 0267-68, Pg ID 258-59.) Huq also documented that Schneider was an intravenous ("IV") drug abuser with complaints of diarrhea and skin crawling. (*Id*. at WC 0267, Pg ID 258.) She noted his history of hypertension, hepatitis C, and possible diabetes, and took his vitals, blood pressure, and respiratory rate. (*Id*. at WC 0267-68, Pg ID 258-59.) Huq noted that Schneider was crying on and off during the exam. (*Id*. at WC 0268, Pg ID 259.)

Huq ordered Schneider to be started on an opiate protocol (i.e., for withdrawal of IV drug use) and prescribed Loperamide for his diarrhea, Humulin, and insulin. (*Id*. at WC 0268-69, Pg ID 259-60.) Huq also indicated that Schneider's urine ketones and blood sugar levels should be routinely checked. (*Id.*; Defs.' Reply Ex. 2.1 at 39, ECF No. 40-4 at Pg ID 810.) She ordered an x-ray of his ribs and a follow-up appointment with her the next week. (Defs.' Mot., Ex. 5 at WC 0168-69, ECF No. 32-6 at Pg ID 259-60.) According to Huq's instructions, Schneider received the opiate protocol starter pack of Catapres, Benadryl and Imodium prior to leaving the clinic. (Defs.' Mot., Ex. 9, ECF No. 32-10 at Pg ID 282.)

Huq testified during her deposition in this matter that when she saw Schneider in the clinic, she had Neal's assessment of him but not Storey's completed intake form. (Defs.' Reply, Ex. 2.1 at 23, 41, ECF No. 40-4 at Pg ID 806, 810.) According to Huq, she normally would have an inmate's intake form when she performs an examination. (*Id*.) Huq testified that she did not have Schneider's form in front of her, because she saw him so shortly after the intake was conducted and it was being

put into the record while she was examining him.  (*Id.*)  She acknowledged, however, that she could have accessed the information online.  (*Id*. at 73, Pg ID 818.)

Neal informed Huq that Schneider needed treatment for heroin withdrawal. (*Id*. at 22, Pg ID 806.)  Having not seen the intake form, Huq was unaware of any previous history of suicide attempts by Schneider or past psychological hospitalizations and Schneider did not share that information with her.  (*Id*. at 22-23, 25-27, Pg ID 806-07.)  Schneider did not tell Huq that he was taking some psychological or psychotropic medication.  (*Id*. at 26, Pg ID 807.)  She knew that Neal asked him about his medications and pharmacy and that he gave no information about either.  (*Id*.)

Huq testified that she found nothing in Neal's report indicating that Schneider was depressed or having mental health issues.  (*Id*.)  Huq further testified that she always asks inmates about their psychological health (*id*. at 32-33, Pg ID 808), and that she did not observe or hear anything during her examination of Schneider that led her to believe he was depressed or had issues with mental health.  (*Id*. at 27, 34, Pg ID 807, 809.)

Huq further testified that information on the intake form, including Schneider's psychological history and report of hearing voices as a symptom of heroin withdrawal, would not have caused her to refer him for an immediate psychological evaluation.  (*Id*. at 74-75, Pg ID 819.)  According to Huq, almost all of the jail's inmates are on some type of psychotropic medication and such use or past use does

not correlate "at all" with someone being suicidal, nor does the fact that an inmate cries in her presence. (*Id*. at 59, 64, Pg ID 815-816.) Huq also testified that, because of Storey's referral, a mental health provider would have evaluated Schneider the following day, Saturday, November 8. (*Id*. at 43-44, Pg ID 811.)

At 5:20 a.m. that morning, jail nurse Brenda Williams, LPN, did see Schneider in the medical clinic to test his blood sugars. (Defs.' Mot., Ex. 12, ECF No. 32-13.) Schneider's levels were in the normal range, so Williams did not give him insulin. (*Id*.) According to Williams, had Schneider mentioned suicide or expressed any suicidal ideations during her interaction with him, she would have documented it in his record and immediately contacted the charge nurse for a mental health referral. (*Id*.) No such documentation appears. (Defs.' Mot. Ex. 5, ECF No. 32-6.)

At 7:00 a.m., Defendant Wayne County Corporal Gerald Thomas came on duty as the housing officer for the jail's general population intake unit where Schneider was housed. (Defs.' Reply, Ex. 2.5 at 8, ECF No. 40-4 at Pg ID 933.) No one told Thomas to pay special attention to Schneider and he was unaware of Schneider's past suicide attempts. (*Id*. at 9, 12-13, 16, Pg ID 933, 934, 935.) Thomas also did not know that a psychological referral had been made for Schneider during his intake interview. (*Id*. at 13, Pg ID 934.) Thomas did not interact with Schneider when he made his rounds of the unit that morning and he did not notice anything amiss or wrong with Schneider. (*Id*. at 46, 48-49, Pg ID 943.)

Thomas testified that he had received training for detecting if an inmate is depressed or suicidal. (*Id*. at 86-87, Pg Id 953.) Thomas also was trained to contact medical staff if an inmate needs medical help. (*Id*. at 66, Pg ID 948.) Thomas then could send the inmate up to the medical unit or, if needed, an officer would escort the inmate there. (*Id*. at 67, Pg ID 948.) Inmates are allowed to leave the housing unit unaccompanied as the Dickerson Facility is a low security jail. (*Id*.) However, if Thomas learned that an inmate was suicidal, Thomas would immediately contact the medical unit and the inmate would be escorted there. (*Id*. at 72-73, Pg ID 949.) Wayne County does not incarcerate inmates at its Dickerson Facility who are suicidal or who have other psychological issues requiring special observation; rather, they are transported to another Wayne County jail location. (Defs.' Reply, Ex. 2.3 at 43-44, 62-65, ECF No. 40-4 at Pg ID 865-66, 870-71.)

Shortly after noon on Saturday, November 8, another Wayne County officer, Corporal Templeton, relieved Thomas for his lunch break and Thomas left the housing unit. (*Id*. at 8, 18-19, Pg ID 933, 936.) At around 1:00 p.m., another inmate, Victor Long, saw Schneider on some steps and Schneider asked Long if he had any coffee. (Defs.' Mot., Ex. 15, ECF No. 32-16 at Pg ID 369.) Around the same time, inmate Raymond Anderson spoke with Schneider. (*Id*., Pg ID 368.) Schneider told Anderson he was upset about not getting medical attention and that he needed his pills "for bi-polar depression." (*Id*.) Schneider also told Anderson that he was

10

contemplating suicide. (*Id.* There is no evidence, however, that Anderson reported this information to anyone until after Schneider in fact attempted suicide. (*Id.*)

At around 1:00 p.m., Templeton began doing his rounds of the housing unit. (Defs.' Mot., Ex. 16 at 3, ECF No. 32-17 at Pg ID 373.) When he got to the showers, Templeton observed what appeared to be someone sitting behind the door of a shower stall. (*Id.*) Not hearing any water running, Templeton opened the door and found Schneider hanging from a sheet tied around his neck, which Schneider had wedged into the wall gap between two shower stalls. (*Id.*) Templeton immediately called a lock down and asked two nearby inmates to help him get Schneider down. (*Id.*) Templeton began CPR and a "Code Blue" was called. (*Id.*) At that point, Thomas ran to the housing unit where he observed Schneider laying on the floor.[3] (Defs.' Reply, Ex. 2.5 at 49-50, ECF No. 40-4 at Pg ID 943-44.) Jail medical staff continued lifesaving measures until an ambulance arrived and transported Schneider to Detroit Receiving Hospital. (Defs.' Mot., Ex. 16, ECF No. 32-17 at Pg ID 373.) Schneider died at the hospital three days later from his injuries.

Plaintiff filed this lawsuit in Wayne County Circuit Court on August 5, 2015, naming the following as defendants: Benny N. Napoleon, Wayne County Sheriff; Jeriel Heard, Director of Jails; David Praedel, Commander of the Dickerson Facility; Wayne County; and the Wayne County Sheriff's Department. (Compl., ECF No. 1-

---

[3] Subsequent to the incident, Thomas received some discipline due to his failure to properly log his morning rounds on a "pipe mechanism" he claims was not functioning properly. This discipline is not relevant to Plaintiff's claims.

1.)  Defendants removed Plaintiff's Complaint to federal court on August 14, 2015.

Plaintiff filed an amended complaint on April 25, 2016, adding Thomas as a

defendant.  (First Am. Compl., ECF No. 16.)  On September 2, 2016, Plaintiff filed a

Second Amended Complaint adding Huq and Dr. Keith Dlugokinski, Director of Jail

Health Services for Wayne County, as defendants.  (Second Am. Compl., ECF No.

21.)  Plaintiff states in her pleading that she is suing all of the individual defendants in

their individual capacities.  (*Id*. at 1, Pg ID 142.)

Plaintiff's Second Amended Complaint contains the following counts:

I.       42 U.S.C. § 1983 against Napolean, Heard,
         Praedel, and Dlugokinski;

II.      Gross negligence against all individual defendants;

III.     Violation of Schneider's U.S. constitutional rights
         by Wayne County, Wayne County Sheriff's
         Department, and Napoleon;

IV.      42 U.S.C. § 1983 against Thomas;

V.       Gross negligence against Thomas; and

VII.[4]  42 U.S.C. § 1983 against Huq.

(Second Am. Compl., ECF No. 21.)  The essence of Plaintiff's § 1983 claims is that

Defendants were deliberately indifferent to Schneider's serious medical needs in

violation of the Eighth and Fourteenth Amendments to the United States Constitution.

Plaintiff alleges in her pleading that Napoleon, Heard, Praedel, and Dlugokinski

---

[4] There is no Count VI.

breached their legal duty to establish and implement procedures to ensure that psychiatrically ill inmates, such as Schneider, received needed treatment, supervision, and monitoring, and were denied access to known suicidal implements. Plaintiff further alleges that Wayne County, the Wayne County Sheriff's Department, and Napoleon have customs, policies, and practices of deliberate indifference to suicidal inmates.

## III.   Plaintiff's 42 U.S.C. § 1983 Claims

### A.   Applicable Law

A § 1983 claim alleges that a person acting under color of state law deprived the plaintiff of a right secured by the Constitution or laws of the United States. *See* 42 U.S.C. § 1983. Under the Eighth Amendment, prisoners have a constitutional right to medical care. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). While "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions[,]" *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977), the Supreme Court has held that pretrial detainees "are entitled to the same Eighth Amendment rights as other inmates." *Thompson v. City of Medina*, 29 F.3d 238, 242 (6th Cir. 1994). A pretrial detainee's right to medical care arises, however, under the Fourteenth Amendment's Due Process Clause. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). The analysis set forth for Eighth Amendment claims "applies with equal force to a pretrial

13

detainee's Fourteenth Amendment claims." *Richko v. Wayne Cty.*, 819 F.3d 907, 915

(6th Cir. 2016).

Pursuant to that analysis, "a prison official may be liable … for denying

humane conditions of confinement only if he knows that inmates face a substantial

risk of serious harm and disregards that risk by failing to take reasonable measures to

abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).  A claim alleging deliberate

indifference to an inmate's serious medical needs has both an objective and subjective

component.  As the Sixth Circuit has elaborated:

> To satisfy the objective component, the plaintiff must
> allege that the medical need at issue is "sufficiently
> serious." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct.
> 1970, 128 L.Ed.2d 811 (1994). To satisfy the subjective
> component, the plaintiff must allege facts which, if true,
> would show that the official being sued subjectively
> perceived facts from which to infer substantial risk to the
> prisoner, that he did in fact draw the inference, and that he
> then disregarded that risk. *Farmer*, 511 U.S. at 837, 114 S.
> Ct. 1970. Emphasizing the subjective nature of this inquiry,
> the Supreme Court has noted that "an official's failure to
> alleviate a significant risk that *he should have perceived but
> did not*, while no cause for commendation, cannot under
> our cases be condemned as the infliction of punishment."
> *Id*. at 838, 114 S. Ct. 1970 (emphasis added).

*Comstock v. McCrary*, 273 F.3d 693, 702-03 (6th Cir. 2001).  Nonetheless, an officer

may "not escape liability if the evidence show[s] that he merely refused to verify

underlying facts that he strongly suspected to be true, or declined to confirm

inferences of risk that he strongly suspected to exist." *Farmer*, 511 U.S. at 843 n.8.

The Sixth Circuit has held that a detainee's psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies. *Horn v. Madison Cty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994); *see also Comstock*, 273 F.3d at 703-04 (holding that an allegation "that [the] defendants were indifferent to [an inmate's] psychological needs, namely his suicidal tendency, … *easily satisfies* the objective component of [a deliberate indifference] claim") (emphasis added). This Court therefore assumes that Plaintiff satisfies the objective component of her deliberate indifference claims.

The subjective component of the Eighth Amendment analysis "is meant to prevent the constitutionalization of medical malpractice claims[.]" *Estelle*, 429 U.S. at 106. "[T]hus[,]" the *Estelle* Court explained, "a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment. *Id*. ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment"); *Farmer*, 511 U.S. at 835 (explaining that deliberate indifference "describes a state of mind more blameworthy than negligence"). As the Sixth Circuit has explained:

> When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation. On the other hand, a plaintiff need not show that the official acted "for the very purpose of causing harm or with knowledge that harm will result."

15

> *Farmer*, 511 U.S. at 835, 114 S. Ct. 1970; *see also Horn*,
> 22 F.3d at 660 ("Officials may be shown to be deliberately
> indifferent to such serious needs without evidence of
> conscious intent to inflict pain."). Instead, "deliberate
> indifference to a substantial risk of serious harm to a
> prisoner is the equivalent of recklessly disregarding that
> risk." *Farmer*, 511 U.S. at 836, 114 S. Ct. 1970.

*Comstock*, 273 F.3d at 703.

With respect to suicide claims, the Sixth Circuit "imposes a duty on the part of municipalities to recognize, or at least not to ignore, obvious risks of suicide that are foreseeable. Where such a risk is clear, the municipality has a duty to take reasonable steps to prevent the suicide." *Gray v. City of Detroit*, 399 F.3d 612, 618 (6th Cir. 2005). The court has held that "there is no general constitutional right of detainees to receive suicide screenings or to be placed in suicide safe facilities, unless the detainee has somehow demonstrated *a strong likelihood of suicide*." *Id*. at 616 (emphasis added) (citing *Danese v. Asman*, 875 F.2d 1239, 1244 (6th Cir. 1989); *Crocker v. Cty. of Macomb*, 119 F. App'x 718, 724 (6th Cir. 2005) (unpublished)). However, the Sixth Circuit "has consistently recognized a prisoner's established right to medical attention *once the prisoner's suicidal tendencies are known*." *Comstock*, 273 F.3d at 711 (emphasis added) (citing cases); *see also Gray*, 399 F.3d at 616 ("a right to screening for suicidal propensities or tendencies arises when it is *obvious* that an inmate has such tendency or propensity") (internal quotation marks and citation omitted, emphasis added). The Sixth Circuit recognizes that "[s]uicide is a difficult

event to predict and prevent and often occurs without warning." *Gray*, 399 F.3d at 616.

## B. Application

Guided by the standards set forth above, the Court finds that Plaintiff has not established a constitutional claim against the individual defendants, with the exception of Huq. As to Huq, the Court concludes that reasonable minds could differ with respect to her liability.

### 1. The Individual Defendants Except Huq

Only two of the named defendants, Huq and Thomas, interacted with Schneider. Thomas did not perceive Schneider to be suicidal nor was he presented with evidence from which he should have perceived such a risk.[5]

Plaintiff points out that Schneider tried to commit suicide while previously incarcerated at the Ecorse jail,[6] but there is no evidence suggesting that this information was conveyed to anyone at the Wayne County jail.[7] Plaintiff asserts that

---

[5] In her response brief, Plaintiff in fact acknowledges that Thomas was not advised of any of Schneider's pertinent history, contending that this was "the most unbelievable deficiency[.]" (Pl's Resp. at 4, ECF No. 34 at Pg ID 380, emphasis removed.)

[6] In her factual recitation, Plaintiff also includes that Schneider had been receiving social security disability payments for a number of years because of bipolar and manic depressive psychological problems. (Pl.'s Resp. at 2, ECF No. 34 at Pg ID 378.) There is no evidence that this information was conveyed to Defendants.

[7] Storey did learn that Schneider previously attempted to harm himself or commit suicide and, had she inquired further, may have learned about this recent suicide attempt. In fact, the intake screening form suggests that if an inmate answers "yes" as to whether he or she ever attempted suicide, jail personnel are supposed to seek

17

Defendants should have discovered this information, contending that they had "an affirmative duty to make further inquiry and use readily available community health information and other sources available." (Pl.'s Resp. at 8, ECF No. 34 at Pg ID 384.) Plaintiff cites no case law imposing such a duty, however. In fact, federal courts have held that "[j]ails are under no constitutional obligation to probe the files for the health histories of their inmates at other facilities." *Schreiber v. Cty. of Crawford*, No. 01-10083, 2002 WL 1907974, at *8 (E.D. Mich. Aug. 20, 2002) (unpublished) (citing *Hott v. Hennepin Cty., Minn.*, 260 F.3d 901, 906 (8th Cir. 2001)). The Sixth Circuit's decision in *Crocker* further supports that Defendants were under no duty to uncover this information.

In *Crocker*, a jail suicide case, the Sixth Circuit affirmed the district court's grant of summary judgment to the defendants on the plaintiff's § 1983 deliberate indifference claim, finding insufficient evidence to permit a reasonable jury to conclude that the defendants were liable for the inmate's suicide. 119 F. App'x at 723. The court found no evidence that any individual defendant had information indicating that the inmate would attempt suicide. *Id*. The Sixth Circuit reached this conclusion even though there was a "Mental Order" listed in the Law Enforcement Information Network stating that the decedent's "Mental Behavior May Result in

_____

further details. (*See* Defs.' Mot., Ex 5 at WC0265, ECF No. 32-6 at Pg ID 256.) It does not appear that Storey asked Schneider to explain, as she did not enter information into that section. (*Id*.) Nevertheless, Storey is not a defendant in this action.

Harm to Self or Others," and despite the fact that the county sheriff's department received information three months earlier that the individual "was going to commit suicide" and had "attempts in the past involving cutting of [the] wrist." *Id*. at 721, 723.

The cases Plaintiff cites are distinguishable from the present matter. In *Wilson v. Genesee County*, No. 00-73637, 2002 WL 745975 (E.D. Mich. Mar. 26, 2002) (unpublished), the Honorable Avern Cohn denied summary judgment to three individual defendants, finding that they were aware that the plaintiff's decedent had pointed a gun at his head and pulled the trigger during a stand-off with police and told the police to shoot him and put him in a body bag. *Id*. at *8-9. Significantly, however, Judge Cohn granted summary judgment to other defendants because this information was not shared with them and they had no other specific information indicating that the decedent was a suicide risk. *Id*. In *Burns v. Robertson County*, 192 F. Supp. 3d 909 (M.D. Tenn. 2016), on the day the plaintiff's decedent was arrested, the jail administrator "received three telephone calls from individuals relaying concerns that [he] was at risk for committing suicide." *Id*. at 912.

Similarly, in *Gordon v. Kidd*, 971 F.2d 1087 (4th Cir. 1991), as Plaintiff states, "there was notice of a suicide threat." (*See* Pl.'s Resp. at 20, ECF No. 34 at Pg ID 396.) The plaintiff's decedent in *Gordon* was arrested after exhibiting suicidal behavior (i.e., holding a four-inch steak knife pressed against his chest near his heart), and this information was communicated to the arresting officers and all but one of the

jail personnel defendants. 971 F.2d at 1089-92. The Fourth Circuit granted summary judgment to all but one of the defendants because they either took appropriate action in response to the knowledge of the decedent's risk of suicide or were unaware of that risk. *Id*. at 1094-95. The sole defendant denied summary judgment was provided "with sufficient notice that a suicide attempt might be imminent" and failed to take any action in response. *Id*. at 1095.

Finally, in *Hall v. Ryan*, 957 F.2d 402 (7th Cir. 1992), the court found a genuine issue of material fact with respect to whether the defendants "actually knew" that an inmate, Clifford Howard, Jr. ("Howard"), was a serious suicide risk based on Howard's numerous past encounters with the city's police department where he subsequently was jailed and attempted suicide. *Id*. at 403-04, 405. Howard's past encounters with the police department included 28 arrests and 9 detentions. *Id.* at 403. Nine months before the suicide attempt at issue, Howard "was arrested by [the city's] police officers at his home armed with a gun and threatening to commit suicide." *Id*. at 403-04. The report from that incident reflected that he had attempted suicide several times. *Id*. at 404. The local newspaper also carried an article about the incident. *Id.* Additionally, a few months before Howard's attempted jail suicide, his family members met with the city's police chief to advise him of Howard's mentally disturbed and suicidal condition. *Id.*

Schneider, in comparison, appears to have never been incarcerated at a Wayne County Jail facility. Further, there is no evidence to create a genuine issue of material

fact as to whether Thomas actually knew of Schneider's past suicide attempts or suicidal risk.

The Court does not find the opinions of Plaintiff's experts, Drs. Gerald Shiener and Alvin Cohn, persuasive.  (*See* Pl.'s Resp., Exs. I, J, ECF Nos. 34-5, 34-8.)  For one, their opinions on the ultimate issue of deliberate indifference are expressions of a legal conclusion and are outside the scope of admissible expert testimony.  *Berry v. City of Detroit*, 25 F.3d 1342, 1353-54 (6th Cir. 1994) (holding that an expert "may not testify … that [the defendant's policies] indicated that the City was deliberately indifferent to the welfare of its citizens").  Second, Drs. Shiener's and Cohn's opinions have little probative value due to two significant defects in their analysis.  First, they are based on an incorrect understanding of what the law requires (for example, a right to be screened properly for suicidal tendencies or a duty to obtain an inmate's records from other jails).  Second, their opinions are premised on the unsupported assertion that Defendants were aware of Schneider's mental health history or that he posed a suicide and self-harm risk.

Dr. Shiener opines that "[t]he risk of suicide was well-known to all the Defendants … on the date of [Schneider's] incarceration" because "inmate suicide and self-harm[] is a well-known and identified consideration, and risk of harm to anyone confined in a jail or lockup facility."  (Pl.'s Resp., Ex. I ¶ 5, ECF No. 34-5 at Pg ID 409.)  Similarly, Dr. Cohn opines: "all the Defendants in this case had actual knowledge of the risk of psychological [sic] ill inmates entering the Dickerson

Correctional Facility with severe psychological problems with the potential for violence towards others, suicide and self-harm." (*Id*., Ex. J ¶ 4, ECF No. 34-8 at Pg ID 432-33.) However, the risk of suicide in prisons, *generally*, is not the relevant inquiry for purposes of deliberate indifference in a jail suicide case. As the Sixth Circuit's decision in *Crocker* indicates, a plaintiff cannot ever establish an officer's subjective knowledge of an inmate's risk of suicide based on a profile of individuals likely to commit suicide. *Crocker*, 119 F. App'x at 723.

In *Crocker*, the Sixth Circuit found no evidence "that any individual defendant had information indicating that Tarzwell [the plaintiff's decedent] was a suicide risk." *Id*. The plaintiff argued "that Tarzwell fit the profile of an individual who is purportedly 'most likely to commit suicide.'" *Id*. The Sixth Circuit responded to this argument as follows:

> Assuming that the profile is statistically valid and that [the decedent] possessed the characteristics of an individual who fits the profile, this alone is insufficient to put defendants on notice that [the decedent] himself was likely to attempt suicide. Jail officials cannot be charged with knowledge of a particular detainee's high suicide risk based solely on the fact that the detainee fits a profile of individuals who purportedly are more likely to commit suicide than those who do not fit the profile in all respects.

*Crocker*, 119 F. App'x at 723. Thus, absent knowledge that Schneider, himself, was likely to commit suicide, Plaintiff cannot show that Defendants were deliberately indifferent to his serious medical needs.

**2.    Huq**

Huq, however, did have access to information that reasonable jurors could conclude would have put her on notice that Schneider was a suicide risk. Specifically, in addition to what Huq gleaned during her examination of Schneider and what was reported by Neal, information was available to Huq through Storey's intake of Schneider's past suicide attempt, history of psychiatric illness, and current use of medication for bipolar disorder. As Huq testified, she usually has the intake information when she performs an examination and she could have accessed the information online. The Court believes that reasonable minds could differ as to whether Huq's failure to review that information amounted to deliberate indifference.

In other words, it is a jury question as to whether Huq recklessly disregarded available information evidencing Schneider's risk of suicide. While Huq testified that she would not have made an immediate psychological referral even if she had seen the intake information indicating Schneider's prior suicide attempt, reasonable jurors could find her testimony self-serving. This may be a slender reed but nonetheless is sufficient to present a genuine issue of a material fact. Accordingly, the Court ultimately concludes that Plaintiff is entitled to her day in court with respect to her § 1983 claim against this defendant.

### 3. Municipal Liability

In her Second Amended Complaint, Plaintiff alleges that Napoleon, Heard, Praedel, Dlugokinski, Wayne County, and the Wayne County Sheriff's Department are liable based on their failure to provide adequate policies, customs, practices, or

training in relation to suicidal inmates. (*See, e.g.*, Second Am. Compl. ¶¶ 26, 30, 43-50, ECF No. 21 at Pg ID 151, 157-58.) In response to Defendants' summary judgment motion, however, Plaintiff does not address her municipal liability claim and thus has abandoned it. *Briggs v. Univ. of Detroit-Mercy*, 611 F. App'x 865, 870 (6th Cir. 2015) (quoting *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 371 (6th Cir. 2013) ("'This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.'"); *Clark v. City of Dublin, Ohio*, 178 F. App'x 522, 524-25 (6th Cir. 2006) (finding that, when a plaintiff did not properly respond to arguments the defendant asserted in its summary judgment motion as to two claims, "the District Court did not err when it found that the Appellant abandoned [those] claims."). Moreover, Plaintiff seems to concede in her response brief that adequate policies were in place to handle suicidal inmates, but that those policies were ignored or "disregarded."[8] (*See* Pl.'s Resp. at 5-7, ECF No. 34 at Pg ID 381-83.)

---

[8] While the Court is bothered by Storey's failure to inquire further of Schneider's past suicide attempt during the intake interview, Plaintiff offers no evidence to establish that this was due to a failure to properly train Storey or the "pattern of similar constitutional violations by untrained employees" that "is 'ordinarily necessary' to demonstrate deliberate indifference for failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). While municipal liability can be established without alleging a pattern of past misconduct, the plaintiff then must show "a complete failure to train . . . , or training that is so reckless or grossly negligent that future [jail staff] misconduct is almost inevitable." *Hays v. Jefferson Cty.*, 668 F.2d 869, 874 (6th Cir. 1982)). Plaintiff does not make this showing, either.

**IV.     Plaintiff's Gross Negligence Claim**

Plaintiff asserts a gross negligence claim against the individual defendants in Count II of her Second Amended Complaint and against Thomas, only, in Count V. Defendants seek summary judgment with respect to these claims, arguing that they are entitled to immunity under Michigan's governmental immunity statute, Michigan Compiled Laws § 691.1407.

Section 691.1407 provides in relevant part that officers and employees of governmental agencies are "immune from tort liability for an injury to a person or damage to property caused by the officer, employee … while in the course of employment …." Mich. Comp. Laws § 691.1407(2).  Three elements must be met for immunity to apply, however:

> (a) The officer, employee, … is acting or reasonably believes he or she is acting within the scope of his or her authority.
>
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
>
> (c) The officer's, employee's, … conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

*Id.* § 691.1402(2)(a)-(c).  Defendants' ability to satisfy the first two elements does not appear to be in dispute.  However, the parties dispute the third element—specifically, whether Defendants' conduct was the proximate cause of Schneider's injuries.

The term "proximate cause" has a specific and narrow meaning for purposes of Michigan's governmental immunity statute. *Smith v. Cty. of Lenawee*, 600 F.3d 686, 691 (6th Cir. 2010). In *Robinson v. City of Detroit*, 613 N.W.2d 307 (2000), the Michigan Supreme Court held that, for purposes of the statute, the term means "*the one* most immediate, efficient, and direct cause preceding an injury." *Id*. at 317 (emphasis added). The Court reasoned that "[t]he [Michigan] Legislature's use of the definite article 'the' clearly evidences an intent to focus on one cause." *Id*. In reaching this conclusion, "[t]he *Robinson* Court overruled prior Michigan court precedent to the extent that the prior decisions interpreted 'the proximate cause' to mean anything other than the sole proximate cause." *Smith*, 600 F.3d at 691 (citing *Robinson*, 613 N.W.2d at 318). As such, Plaintiff's reliance on the Michigan Supreme Court's 1946 decision in *Brackins v. Olympia, Inc.*, 25 N.W.2d 197, to define proximate cause is misplaced.[9]

After defining probable cause for purposes of the Michigan governmental immunity statute in *Robinson*, the Court went on to hold that police officers were entitled to immunity in two cases where passengers in vehicles fleeing from the police were killed when the vehicles crashed. 613 N.W.2d at 312-13, 319. The Court reasoned that the officers' "pursuit of the fleeing vehicles was not, as a matter of law, 'the proximate cause' of the injuries sustained by the plaintiffs." *Id*. Instead, the

---

[9] *Brackins* also is not helpful because the Court was not addressing proximate cause in the context of Michigan's governmental immunity statute.

26

Court held, "[t]he one most immediate, efficient, and direct cause of the plaintiffs' injuries was the reckless conduct of the drivers of the fleeing vehicles." *Id.*

Applying *Robinson*'s definition of probable cause in *Schreiber*, Eastern District of Michigan District Judge David Lawson held that one of the defendants was not entitled to governmental immunity with respect to the plaintiff's gross negligence claim in a jail suicide case. *Id.* at *15. As Judge Lawson interpreted *Robinson*, the Michigan Supreme Court did not state "that the defendant's gross negligence must be the sole cause, but rather it must be the one most directly related to the event." *Id.* at *14. Relying on a case preceding *Robinson*, *Hickey v. Zezulka*, 487 N.W.2d 106 (Mich. 1992), Judge Lawson further wrote: "In jail suicide cases … the Michigan Supreme Court has held that the question of causation cannot be divorced from the question of foreseeability." *Id.* at *15. Thus, Judge Lawson concluded:

> If [the defendant]'s duty was to take reasonable measures to prevent the very act that occurred, and the act of suicide was foreseeable under the circumstances, then a jury could conclude that [the defendant]'s act of confining [the inmate] in a private place, out of view of jail personnel, with the means to bring about the result which the unobserved security measures were intended to prevent, was "the one most immediate, efficient and direct cause" of the suicide.

*Id.* The Michigan Court of Appeals declined to adopt Judge Lawson's reasoning, however, in a subsequent jail suicide case: *Cooper v. Washtenaw County*, 715 N.W.2d 908 (2006).

According to the *Cooper* court, foreseeability plays no role in determining the proximate cause for purposes of Michigan's governmental immunity statute. 715 N.W.2d at 910. The Michigan Court of Appeals explained:

> The decisions of this Court and our Supreme Court that address the issue of "the proximate cause" under MCL 691.1407(2) in circumstances in which there were multiple causes of the harm do not discuss the concepts of intervening and superceding causation and do not indicate that foreseeability of an intervening cause is relevant to whether it may be deemed "the proximate cause" under the statute.

*Id*. The *Cooper* court concluded "that the one most immediate, efficient, and direct cause of [the inmate]'s death was his own conduct. *Id*. at 909. The court therefore held that the defendants were immune from tort liability under Section 691.1407(2). *Id*. at 910-11.

While this Court believes that the *Cooper* court's understanding of *Robinson* is the correct one, the result is the same whether the Court follows *Cooper* or *Schreiber*. Pursuant to *Cooper*, Schneider's own conduct was "the one most immediate, efficient, and direct cause" of his death. The Court has concluded that the individual defendants were unaware of Schneider's suicidal risk and, thus, his suicide was not foreseeable. Pursuant to *Schreiber*, the individual defendants' failure to take precautions to prevent Schneider from committing suicide therefore was not the proximate cause of his death. As such, Defendants are entitled to qualified immunity under Section 691.1407(2).

## V.    Conclusion

For the reasons discussed above, the Court concludes that Plaintiff fails to establish that any defendant, except Huq, was deliberately indifferent to Schneider's serious medical needs to establish liability under 42 U.S.C. § 1983.  Reasonable minds could differ as to Huq's liability.  With respect to Plaintiff's gross negligence claim under Michigan law, the Court holds that the individual defendants are entitled to qualified immunity under Michigan Compiled Laws Section 691.1407(2).

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART** in that Counts I-V of Plaintiff's Second Amended Complaint are **DISMISSED WITH PREJUDICE** and all defendants, except Huq, are dismissed as parties to this lawsuit.

> s/ Linda V. Parker
> LINDA V. PARKER
> U.S. DISTRICT JUDGE

Dated: March 15, 2018

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, March 15, 2018, by electronic and/or U.S. First Class mail.

> s/ R. Loury
> Case Manager